IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| ALITA LITTLETON, et al. | * | |
|---|---|---|
| | * | |
| Plaintiffs | * | |
| | * | |
| v. | * | Civil No. **PJM 07-1409** |
| | * | |
| **PRINCE GEORGE'S COUNTY,** | * | |
| **MARYLAND, et al.** | * | |
| | * | |
| Defendants | * | |
| | * | |

## MEMORANDUM OPINION

Alita Littleton, in her individual capacity and as Personal Representative of the estate of her deceased son, Gregory Boggs, Jr., and Lanaya Borden, Boggs' girlfriend, sued Prince George's County, Maryland, its then Chief of Police Melvin High, and Officer Jordan Swonger in eight counts stemming from an incident that resulted in Boggs' death on September 18, 2006. The original Counts were styled: I Survival Act; II Wrongful Death; III Excessive force/police brutality; IV Assault and Battery; V Deprivation of Civil Rights (42 U.S.C. § 1983); VI Negligent Training & Supervision by Prince George's County; VII Intentional/Negligent Infliction of Emotional Distress; and VIII Violation of the Maryland Constitution.[1]

---

[1] Earlier in the proceedings, the Court granted High's Motion to Dismiss as to all counts and he was dismissed from the case. Thereafter, the Court granted in part and denied in part Prince George's County and Swonger's Motion for Summary Judgment. Summary Judgment was granted in favor of the County as to all counts and it was dismissed from the suit. Summary judgment was granted in favor of Swonger as to Count IV (assault and battery) and as to Count VII (Littleton's claims of both intentional and negligent infliction of emotional distress and Borden's claim of negligent infliction of emotional distress). Littleton's claims in Counts I (Survival Act), II (Wrongful death), III (Excessive Force/police brutality), V (Deprivation of Civil Rights -42 U.S.C. § 1983), and VIII (Violation of the Maryland Constitution) remained. Borden's claim in Count VII (intentional infliction of emotional distress) also remained.

A jury hearing the case deadlocked and a mistrial was declared. Swonger has since filed a Renewed Motion for Summary Judgment based upon the record made at trial, and asks for dismissal of all counts against him. For the reasons that follow, his Motion for Summary Judgment is **GRANTED**.

**I.**

The trial record shows as follows:

On September 18, 2006 Swonger was working as a patrol officer in Prince George's County. At approximately 1:13 a.m., he received a dispatch call after a citizen reported that on Walker Mill Road in District Heights, Maryland, a male was assaulting a female after having exited from a red vehicle with Virginia tags. Swonger and other officers proceeded to that location to investigate, but did not encounter any individuals matching the description of the dispatch call. About 30 minutes later, Swonger received a second dispatch call reporting an assault with similar characteristics taking place at Rochelle Ave, in District Heights, Maryland not far from where the first incident had reportedly taken place.

Swonger was the first officer to arrive at the 1900 block of Rochelle Avenue, proximate to an apartment complex. He testified at trial that, upon arriving, he saw two people engaged in a violent encounter. Swonger said that he saw a female on the ground while a male, standing over her with one foot on either side of her hips, was holding her either by the neck and was choking her or was shaking her shoulders in a violent manner. The two individuals were later identified as Gregory Boggs and Lanaya Borden. Swonger also testified that he radioed-in the exact location of the incident to summon other police units to provide backup. He then exited his vehicle, slamming the door to get the attention of the couple and began walking towards them,

pointing a flashlight with his left hand. He testified that because the assault was in progress, he did not wait for backup to arrive.

Swonger testified that once Boggs saw him, Boggs began to pickup Borden off the ground. Swonger has stated that he heard Boggs say to Borden "Let's go" and that in response Borden said "no" several times. Swonger said he told the couple to sit on the ground so he could sort out the situation, but received no verbal response from either Boggs or Borden. Swonger said that Boggs in fact was attempting to drag Borden toward a red car with Virginia plates parked directly behind Boggs. Swonger testified that seeing this, he decided to walk to his right in a wide arc in order to position himself between the two individuals and the car, so as to stop Boggs from advancing toward the vehicle. Swonger said that, as he was moving in a wide arc, he observed Boggs shift his position so as to put Borden in front of him, placing his left arm over the top of Borden's left shoulder and across Borden's neck.

Swonger testified that, because he could not see Boggs' right hand, he instructed Boggs to show his hands. According to Swonger, when Boggs did not comply, Swonger drew his weapon and kept it "at the low ready," while continuing to give verbal commands to Boggs to put the girl down and show his hands.

Swonger testified that while Boggs continued to have his left arm around Borden's neck, he saw him begin to move his right arm back and forth behind Borden. According to Swonger, he could not see Boggs' right hand, but it appeared that he might be removing objects from his waistband area and stuffing them into Borden's back pockets. Swonger said that because he was unable to see what Boggs was doing with his right hand and fearing for his safety, he started to move back towards his patrol car for cover. Swonger testified that as he was retrieving, he saw Boggs' nostrils flare and his eyes open wide. Swonger said he then saw Boggs lower his center

of gravity and in one fluid motion Boggs threw Borden to the ground, reached behind himself with his right hand, and retrieved a black object with a significant mass. Swonger testified he thought that the object in Boggs' right hand was a weapon and, fearing for both his own safety and that of Borden, he discharged a single round from his weapon at Boggs. After he fired one shot, Swonger fled to the patrol car for cover and, when he did not hear any shots fired back, glanced back and saw Boggs on the ground and Borden sitting next to him. Swonger then got on the police radio and reported "shots fired," a call that was recorded at 1:46:07 a.m. Swonger said that he then walked towards Boggs and told Borden to "back up" and "go sit on the curb," because he believed Boggs had retrieved a weapon and Swonger did not want Borden to pick it up. Swonger testified that Borden was "emotional," crying and shouting at him, until she eventually walked away from Boggs. Swonger said that, as he approached Boggs' body, he saw a wallet in Boggs' right hand, which he then brushed with his foot to push it out of Boggs' hand.

Pictures taken during the autopsy show that the bullet wound in Boggs was about two inches from the midline on the right side of his chest. Pictures also show what appeared to be fresh scratch marks on the left side of Boggs' neck. An evidence technician recovered a wallet at the scene.

Borden testified to a different version of the events. She admitted that she and Boggs were having an argument over Boggs' cell phone, which Borden was trying to grab from him, in order to find out who had just made a call to Boggs. She stated that she was never on the ground but that at some point prior to Swonger's arrival, both she and Boggs went to the ground scrambling for Boggs' cell phone. Borden testified that she and Boggs were standing on the sidewalk and Boggs was attempting to take the phone from her hand when she heard the door of a vehicle being slammed. She testified that they turned toward the street and she saw a car's

4

headlights and then a police officer approaching them with his gun pointed directly at them. She testified that she heard the officer tell them "put your hands up" and that she and Boggs looked at each other and were attempting to comply with Swonger's order when, without warning, Swonger suddenly discharged his weapon. Borden testified that she did not see the shot being fired but only heard it. Borden said that she only managed to raise her right arm but not her left, because her left thumb was still under Boggs' arm when she heard the shot. As for the position of Boggs' arms, Borden testified at trial that Boggs raised his right arm to comply with Swonger's command but her statement to the police immediately after the incident had been that: "He still had his left arm around my neck. <u>His right arm, I cannot say. I can't honestly say</u>." (emphasis added). Borden further testified that, while she was standing in front of Boggs, he at no time attempted to put anything in her back pockets and that neither Swonger nor any other officer ever asked her to empty her pockets at the scene or afterwards.

Borden testified that she was still standing in front of Boggs when she heard the shot and that Boggs fell forward onto her after being hit. According to Borden, Boggs' knee hit the back of her leg and he then slid down to the ground, staining the back of her pants with his blood. Borden's pants with blood stains were introduced at trial. Borden further stated that when she first heard the shot, she thought that she had been hit but then realized it was Boggs who had been shot.

Borden stated that once Boggs was on the ground, Borden testified that she kneeled down to assist him, but before she could touch him, she saw Swonger stepping toward her with the gun pointed at her. She said that she saw nothing in Boggs' right hand before she stepped away from Boggs following Swonger's order. Borden testified that Swonger's actions placed her in fear of her life; that she was hysterical and screaming, asking Swonger why he had shot Boggs, because

5

Boggs was unarmed and had done nothing to justify the shooting. Borden testified that once she moved away from Boggs, Swonger remained close to Boggs' body, but that he did not touch or help Boggs in any way. Borden testified that she saw Swonger make a motion like he was talking to his shoulder and then another police car pulled up and Officer Ricks came out and took her across the street.

## II.

A motion for summary judgment under Rule 56 challenges the factual sufficiency of the complaint. Summary judgment is appropriate when "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). A party is entitled to summary judgment if the evidence in the record "show[s] that there is no genius issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Cleotex v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Summary judgment is properly granted against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial. *Cleotex*, 477 U.S. at 322-23. The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Id*. at 323. Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The court is obligated to view the facts and inferences drawn from the facts in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970); *Matsushita,* 475 U.S.

at 587-88. The non-moving party may not rest upon its mere allegations, however, but must "set out specific facts showing genuine issue for trial." Fed. R. Civ. P. 56(e)(2). Moreover, "'a mere scintilla of evidence is not enough to create a fact issue.'" *Barwick v. Cleotex Corp.*, 736 F.2d 958-59 (4th Cir. 1984) (citation omitted). There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

### III.

The question at this juncture is whether there is a genuine issue of material fact as to whether Swonger used excessive force when he fired at Boggs.

### A.

In Counts III and V of the Complaint, Littleton asserts that Swonger used excessive and unreasonable force against Boggs in violation of his rights under the Fourth and Fifth Amendments to the Constitution.

Title 42, Section 1983, of the United States Code provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law...." 42 U.S.C. § 1983; *see Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977). Section 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 US 266, 271 (1994). As such, a court must begin its analysis of a § 1983 claim by identifying the specific

7

constitutional right allegedly infringed. *Id.* (quoting *Graham v. M.S. Connor, et al.*, 490 U.S. 386, 394 (1989)).[2]

A claim asserting that a decedent was killed through the application of constitutionally unreasonable force invokes the decedent's Fourth Amendment right to be free of arrests, investigatory stops, or other seizures effectuated by excessive force and must be analyzed under the Fourth Amendment and its "objective reasonableness" standard. *See e.g. Carr v. Deeds*, 453 F.3d 593, 600 (4th Cir. 2006 (citing *Graham*, 490 U.S. at 388).

"[T]he intrusiveness of a seizure by means of deadly force is unmatched." *Tennessee v. Garner*, 471 U.S. 1, 9 (1985). Nonetheless, deadly force may be employed in certain circumstances. Determining whether the amount of force used in a particular situation was reasonable "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake" as well as "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (internal quotations omitted). "Because 'police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving,' the facts must be evaluated from the perspective of a reasonable officer on the scene, and the use of hindsight must be avoided." *Waterman v. Batton*, 393 F.3d 471, 476-77 (4th Cir. 2005) (quoting *Graham*, 490 U.S. at 397).

In addition, "[i]n a rapidly evolving scenario . . . a witness's account of the event will rarely, if ever, coincide perfectly with the officers' perceptions because the witness is

---

[2] There is no dispute that officer Swonger was, at all relevant times, acting under color of state law.

8

typically viewing the event from a different angle than that of the officer. For that reason, minor discrepancies in testimony do not create a material issue of fact in an excessive force claim, particularly when . . . the witness views the event from a worse vantage point than that of the officers." *Anderson v. Russell*, 247 F.3d 125, 130-31 (4th Cir. 2001)(citing *Sigman v. Town of Chapel Hill*, 161 F.3d 782, 788 (4th Cir. 1998) (a witness's discrepant observations cannot effectively impact the credibility of the officer's testimony "as to his perceptions of what he saw from an entirely different-and closer-vantage point")). Therefore, a court must determine reasonableness "based on the information possessed by the officer at the moment that force is employed." *Waterman v. Batton*, 393 F.3d at 477.

In *Anderson,* the Fourth Circuit held that an officer's use of deadly force was reasonable as a matter of law when he shot a suspect who reached towards his back pocket to turn off what turned out to be a Walkman radio because the officer had a well-founded, but mistaken, belief that the suspect was reaching for a weapon. 247 F.3d at 130-31. Similarly, in *Slattery v. Rizzo,* the Fourth Circuit found that an officer reasonably perceived the suspect's action as a threat and discharged his weapon when the suspect did not raise his hands as ordered but instead turned towards the officer with an object in his hand, which the officer mistakenly perceived to be a weapon. 939 F.2d 213, 215-16 (4th Cir. 1991). The Fourth Circuit found the actions of the officers in these cases to be reasonable, even though witnesses testified to the contrary, because the witnesses were deemed not to be in a position to see what was visible to the officers.

In the present case, the parties do not dispute that Swonger got out of his vehicle, slammed the car door, approached Borden and Boggs, commanded them to raise their hands and received no verbal response. It is also undisputed that when Swonger gave the command to

9

"show hands," Borden was standing in front of Boggs with Boggs' left arm over her neck. Swonger testified that he did not see Boggs comply with the command to raise his hands. Again, before trial, Borden statement to the police was that she could not honestly say what Boggs was doing with his right arm, but at trial she testified that Boggs raised his right hand. Under either of her versions of the facts, however, the inalterable fact remains that Borden was not in a position to see what was visible to Swonger because she was standing in front of Boggs facing Swonger. Thus, just as in *Anderson,* Borden did not have the same vantage point as did the officer such that her testimony at trial, even if she was not deliberately changing it, does not create a genuine issue of material fact as to whether Swonger saw Boggs comply with the command to raise hands.

Swonger testified that he shot Boggs because he saw him push Borden to the ground, then use his right hand to retrieve from his back pocket a black massive object that Swonger believed was a gun. The police report shows that a wallet was found on the ground at the scene. Borden, on the other hand, testified that Boggs did not push her to the ground and that she remained standing in front of Boggs at all times prior to hearing the shot. Borden said that Boggs removed nothing from his pockets and that as he remained lying on the ground after being shot, Boggs did not have an object in his right hand.

Whether Borden was pushed to the ground or whether she was still standing in front of Boggs, she still was not in a position to see what was visible to Swonger right before he discharged his weapon. Moreover, her testimony as to her position at the time the shot was fired is inconsistent with the forensic evidence, which showed that Boggs was hit in the midline of his right chest. If, as she said, Borden was standing in front of Boggs, the likelihood is that she and not Boggs would have been hit. As such, Borden's testimony does not create a genuine issue of material fact as to whether Swonger had a reasonable basis to believe that Boggs had a weapon and was going to

use it. As in *Anderson*, Swonger thought, albeit mistakenly, that Boggs was reaching for a weapon and he reasonably feared Boggs could inflict serious physical harm on him or on Borden. Accordingly, the Court finds as a matter of law that Swonger's decision to use deadly force was objectively reasonable under the circumstances and that Boggs' Fourth Amendment right was not violated. Accordingly, Swonger is entitled to summary judgment as to the excessive force claims (Counts III and V).

Swonger also asserts qualified immunity as a defense to Littleton's claim under the Fourth Amendment. Because the Court finds that Swonger's use of force did not violate Boggs' Fourth Amendment rights, it need not reach the issue of qualified immunity, but for the sake of completeness, the Court will nonetheless conduct a qualified immunity analysis. Qualified immunity generally protects government officials from suit when they perform the discretionary duties of their offices. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Defendants bear the burden of establishing qualified immunity. *Cloaninger ex rel. Estate of Cloaninger v. McDevitt*, 555 F.3d 324, 332 n. 10 (4th Cir. 2009). When assessing whether qualified immunity shields government officials from suit, a court must ask two questions: (1) whether the plaintiff has demonstrated the violation of a constitutional right; and (2) if a constitutional right has been violated, whether the right was clearly established, "such that it would be clear to an objectively reasonable officer that his conduct violated that right." *Brown v. Gilmore*, 278 F.3d 362, 367 (4th Cir. 2002). In other words, an officer is entitled to qualified immunity if "a reasonable officer possessing the same particularized information [] *could* have, in light of *Garner*, believed that his conduct was lawful…" *McLenagan v. Karnes*, 27 F.3d 1002, 1007 (4th Cir. 1994), *cert. denied* 513 U.S. 1018, 1 (1994) (emphasis in original).

Summary judgment based upon qualified immunity is improper only where "no reasonable officer could have believed in the lawfulness of his actions." *Wardlaw v. Pickert*, 1 F.3d 1297, 1303 (D.C. Cir. 1993), *cert. denied* 512 U.S. 1204 (1994); *Napier v. Town of Windham*, 187 F.3d 177, 183 (1st Cir. 1999); *Anderson v, Creighton* 483 US 635, 640 (1987). In addition, minor distinctions in testimony will not defeat a finding of qualified immunity since it bears upon the perception of the officer involved. *See e.g. Sigman v. Town as Chapel Hill*, 161 F.3d at 788; *Napier*, 187 F.3d at 187. Therefore, a court must determine whether under the circumstances, "a reasonable officer could have found probable cause to believe that [the deceased] presented a serious threat of personal harm at the time that [the officer] pulled the trigger." *Slattery v. Rizzo*, 939 F.2d at 216.

In the present case, the Court has found that Swonger's conduct did not violate Boggs' constitutional rights. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). But even if Littleton could show that Boggs' Fourth Amendment was violated, Swonger is entitled to qualified immunity unless no reasonable officer could have believed that his actions were lawful. *Slattery v. Rizzo*, 939 F.2d at 216

Swonger was responding to a dispatch call after two independent eye witnesses reported that an assault was in progress. When he arrived at the scene, he saw what appeared to be a violent encounter in progress and identified a red car with Virginia plates that matched the dispatch call. It is undisputed that Swonger commanded Boggs to raise his hands and that Swonger did not receive a verbal response. Swonger testified that he did not see Boggs raise his hands and that he could not account for what Boggs was doing with his right hand until he saw that Boggs was holding a black object which Swonger believed to be a gun. Borden's testimony at trial as to what Boggs did with his hands conflicts with Swonger's version, but again she

simply was in no position to see what was visible to Swonger.[3] Accordingly, the Court finds that, even if Swonger's conduct violated a constitutional right, this is a case where a reasonable officer could have believed that Boggs posed a serious deadly threat. Swonger, then, as a matter of law, is also entitled to qualified immunity for his actions. [4]

Accordingly, Counts III and V are **DISMISSED** with prejudice.

### B.

### Survival Act and Wrongful Death

In Count I of the Complaint Littleton asserts a claim under the Maryland's Survival Act and in Count II a claim for wrongful death against Swonger.

Under the Survival Act, the personal representative of an estate may bring "a personal action which the decedent might have commenced or prosecuted" including an action "against a tort-feasor for a wrong which resulted in the death of the decedent" Md.Code Ann., Est & Trusts § 7-401(y) (2008).

Under the Maryland Wrongful Death Act, a party may bring an action for wrongful death against a person "whose wrongful act causes the death of another. "Md. Code Ann., Cts. & Jud. Proc. § 3-902 (a). *See also*, *Benjamin v. Union Carbide Corp.*, 873 A.2d 463, 472 (Md. Ct. Spec. App. 2005)(an action for wrongful death requires a wrongful act). A wrongful act is "an act, neglect, or default including a felonious act which would have entitled the party injured to maintain an action and recover damages if death had not ensued." Code Ann., Cts. & Jud. Proc. §

---

[3] And, again, before trial Borden told the police that she could not "honestly" say what Boggs was doing with his right hand.
[4] Qualified immunity would provide no defense to Littleton's claim under the Maryland Constitution. *Clea v. City of Baltimore*, 541 A.2d 1303, 1314 (Md. 1988) ([A] public official who violates a plaintiff's rights under the Maryland Constitution is entitled to no immunity.) *See also*, *Ritchie v. Donnelly*, 597 A.2d 432, 446 (Md. 1991). But the state constitutional claim, as indicated, fails on the merits.

3-901 (e). Therefore, a party may only prevail in either cause of action if it can show that the Defendant committed a wrongful act.

In this case, since the Court has found Swonger's use of deadly force reasonable under the circumstances, Littleton cannot show that Swonger committed a wrongful act that would entitle her to recover for wrongful death or survivorship. Summary judgment is **GRANTED** in favor of Swonger and against Littleton as to Counts I and II.

## C.

In Count VII, Borden asserts a claim of intentional infliction of emotional distress ("IIED") against Swonger.

To prevail on an IIED claim, a plaintiff must show that the defendant's conduct was: 1) intentional or reckless; 2) extreme and outrageous; 3) casually connected to the emotional distress, and; 4) the emotional distress must be severe. *Baltimore Clark v. Kinko's Inc.,* 270 F.Supp.2d 695, 701 (D.Md. 2003) (citing *Harris v. Jones*, 380 A.2d 611, 614 (Md. 1977)). In addition, to recover in tort against a law enforcement officer for activities occurring in the course of his or her lawful activities, a plaintiff must show that the officer acted with actual malice toward the plaintiff, i.e. ill will, improper motivation or evil purpose. *Goehring v. United States*, 870 F. Supp. 106, 108 *(*D.Md. 1994*)*; Md. Code Ann., Cts. & Jud. Proc. § 5-301.

The first element of the tort of IIED requires proof that Swonger's conduct was intentional or reckless. Borden alleges that she was in front of Boggs when Swonger, pointing his gun at them, fired. As stated earlier, however, Borden's assertion that she was in front of Boggs at the time the shot was fired is inconsistent with the forensic evidence. However, the

Court need not dwell on this point because Borden's claim clearly does not fulfill the second element of the tort.

Under the second element, Borden must show that Swonger engaged in extreme and outrageous conduct. In order to constitute "extreme and outrageous" conduct, a defendant's actions must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Hines v. French*, 852 A.2d 1047, 1060 (Md. Ct. Spec. App. 2004). The Court has found that Swonger's use of force was not unreasonable under the totality of the circumstances. There mere fact that Borden may have been frightened, even extremely frightened, by lawful police activity gives rise to no cause of action in her favor. *White v. Town of Chapel Hill*, 899 F.Supp. 1428, 1438 (M.D.N.C.1995), *aff'd*, 70 F.3d 1264 (4th Cir.1995) (where defendants acted as reasonable police officers, plaintiff cannot sustain a claim of IIED as a matter of law); *Dean v. Worcester*, 924 F.2d 364, 368 (1st Cir.1991) ("Since the officers' conduct . . . was objectively reasonable in the circumstances, the claims for intentional infliction of emotional distress must fail.")

Summary judgment is **GRANTED** in favor of Swonger and against Borden as to Count VII.

**D.**

In Count VIII of the Complaint, Littleton alleges violation of Articles 24 and 26 of the Maryland Constitution, relying on the same factual allegations used to support her § 1983 excessive force claim.

Maryland interprets Articles 24 and 26 *in pari materia* with their federal counterparts, the Fourteenth and Fourth Amendments respectively. *See e.g. Parker v. State*, 936 A.2d 862, 879

(Md. 2007) (citations omitted). The Fourth Amendment provides the appropriate framework of analysis for constitutional claims arising within the scope of its subject matter, not the general due process clause found in the Fourteenth Amendment. *See Graham*, 490 U.S. at 395. Accordingly, the Fourth Amendment of the Federal Constitution and the 26th Amendment of the Maryland Constitution provide the relevant framework of analysis.

The 26th Amendment of the Maryland Constitution provides that "all warrants, without oath or affirmation, to search suspected places, or to seize any person or property, are grievous and oppressive; and all general warrants to search suspected places, or to apprehend suspected persons, without naming or describing the place, or the person in special, are illegal, and ought not to be granted." Md. Const. Art. XXVI.

The Court's discussion relating to Littleton's claim under the Fourth Amendment controls her claim alleged under the Maryland Constitution as well. Having found that Swonger's use of force against Boggs was not excessive and did not violate Boggs' federal constitutional rights, the same holds true as to the Maryland constitutional claim under its Article 26. Swonger is also entitled to summary judgment against Littleton's claim under the Maryland Constitution.

## IV.

For the foregoing reasons, the Court **GRANTS** Swonger's Renewed Motion for Summary Judgment [Document No. 89] as to all Counts. Final judgment will be entered in favor of Swonger and against both Littleton and Borden and the case will be **CLOSED**.

A separate Order will **Issue**.

**June 20, 2011**

　　　　　　　　　　　　　　　　　　_____ /s/_____
　　　　　　　　　　　　　　　　　　**PETER J. MESSITTE**
　　　　　　　　　　　　　　　　　　**UNITED STATES DISTRICT JUDGE**